**In re PAXSON ELECTRIC COMPANY, Debtor.**

No. 98–05750–3F7.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

April 10, 2000.

See also 242 B.R. 67.

452

John W. Caven, Jr., Charles B. Bennett, Jr., Foley & Lardner, Jacksonville, FL, for Paxson Electric Company.

Rodney L. Russell, Russell Law Offices, Orlando, FL, for Donald Lee.

Norman L. Hull, Norman Linder Hull, P.A., Orlando, FL, for Donald E. Lee.

James H. Post, Smith, Hulsey & Busey, Jacksonville, FL, for First Union.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court on the Objection to Claim of Donald E. Lee (Claim No. 3) filed by Paxson Electric Company ("Debtor") on February 22, 1999. (Doc. 14.) An evidentiary hearing on this Objection was conducted December 7–8, 1999 and December 14–15, 1999. Upon the conclusion of that hearing the Court took the matter under advisement and asked the parties to submit memoranda of law, proposed findings of fact and conclusions of law, and proposed orders. Upon review of the evidence and the presentation of counsel, the Court makes the following Findings of Fact and Conclusions of Law.[1]

### FINDINGS OF FACT

On November 23, 1998, Donald E. Lee ("Lee") filed a Proof of Claim in the amount of $1,963,220. Lee's basis for claim is wages, salaries and compensation that arose from his previous employment with Debtor. Lee alleges that in April of 1981 he modified his employment relationship with Debtor with an oral agreement to receive a percentage of gross profits earned by a joint venture of which Debtor was a partner. Debtor claims no such agreement was made.

### EMPLOYMENT HISTORY

Debtor engaged in commercial and industrial electrical work from the early 1950's and continued in business as an electrical subcontractor until February 1993. Wesley Paxson, Sr. ("Paxson") started Debtor and continuously served as Debtor's president. Bob Lassetter ("Lassetter") and Albert Scott ("Scott") were vice presidents of Debtor with broad duties. Lassetter and Scott oversaw project managers and were responsible for estimating and bidding projects. Debtor employed Lee as a project manager from approximately 1969 through June 1983.

Prior to April 1981, Debtor sought to obtain work at EPCOT in Orlando, Florida. EPCOT is a large Disney attraction that had numerous construction projects that required electrical work. Prior to EPCOT, Debtor performed work at Disney and elsewhere in the Orlando area.

Debtor and Hatzel–Beuhler, a Detroit based electrical contractor, entered a Joint Venture Agreement on January 26, 1979 and formed a joint venture for the purpose of performing work at EPCOT. Debtor entered the Joint Venture Agreement be-

---

1. The Court adopts findings of fact made in this bankruptcy case in its published opinion *In re Paxson Elec. Co.,* 242 B.R. 67 (Bankr. M.D.Fla.1999). Those findings support denial of Lee's motion for relief from stay that sought to liquidate his claim in state court.

cause of Hatzel–Beuhler's contacts with the Tishman Company ("Tishman"), Walt Disney's EPCOT project manager. The relationship between Hatzel–Beuhler and Tishman arose in the Detroit area, where Hatzel–Beuhler had a strong electrical contractor's presence. Debtor anticipated that Tishman would be involved in naming general contractors that would bid individual projects to Disney. Hatzel–Beuhler's historically good relationship with Tishman improved the chances of the joint venture being selected as the electrical subcontractor at EPCOT.

The Joint Venture Agreement provided:

In accordance with a telephone conversation between A.J. Wenzel of Hatzel & Buehler, Inc., and Wesley Paxson of Paxson Electric Company, on January 26, 1979, the following understanding was reached regarding EPCOT, Future World, Orlando, Florida, a project to be bid to the Tishman Construction Company.

1. Hatzel & Buehler, Inc., will prepare budgets with the assistance of Paxson Electric Company. Hatzel & Buehler, Inc., and Paxson Electric Company will prepare a joint estimate on contracts to be bid, and will submit an agreed upon selling price as a two-way (2) Joint Venture to be known as "Hatzel & Buehler, Inc., and Paxson Electric Company, a Joint Venture."

3. In the event the Joint Venture is a successful bidder each Company will assume liability for one-half (1/2) of Bonding.

4. Hatzel & Buehler, Inc., and Paxson Electric Company will advance one-half (1/2) of the necessary financing until operations can handle same.

5. The Joint Venture will manage job.

6. Each Company will supply any tools and equipment it has available at cost to the Joint Venture.

7. No Company will charge any home office overhead.

8. Profits or losses will be divided one-half (1/2) to Hatzel & Buehler, Inc., and one-half to Paxson Electric Company.

Lee did not play any role in establishing the Joint Venture, did not share in the risk related to operation of the joint venture and did not provide any personal guarantees for required loans or bonding.

Scott, as Vice President for Debtor, worked with Hatzel–Beuhler in Debtor's Jacksonville office to estimate and prepare the original EPCOT bid. Prior to 1981, Lee was not involved in bidding or negotiating EPCOT contracts for Debtor. After 1981, Lee was partially involved in estimating and securing major EPCOT contracts, however, Scott, Paxson and/or Hatzel–Beuhler would prepare the bids submitted to general contractors who were bidding on various EPCOT projects. Acquired EPCOT projects would then be managed out of Debtor's Orlando office where Lee served as one of Debtor's project managers.

Around April 1981, Lee and Scott, Lee's supervisor, got into an argument concerning the method of installation of light pole bases at an EPCOT project. Scott informed Lee that certain parking lot light poles had to be removed and reinstalled because two of Debtor's Jacksonville project managers did not believe the poles were being installed correctly. Lee argued with Scott and asked him to support his judgment on the pole installation. Scott refused, and Lee asked to speak to Paxson. Lee claims that Scott told him to continue with his current business and to calm down.

On Monday, April 13, 1981, as a result of this dispute, Lee submitted his written resignation to Scott, with a copy to Paxson.[2] Lee alleges that Paxson requested a

2. The letter addressed to Elbert L. Scott pro- vided:

meeting in Daytona Beach, Florida on April 22, 1981 to discuss Lee's continued employment with Debtor. At this meeting, Lee alleges he submitted the following nine-point list that set out his requirements for continued employment with Debtor:

1. D.E.L. [Lee] reports direct to W.C.P. [Paxson].

2. W.C.P. available as needed to bid and establish relationship with area contractors until D.E.L. can assume these responsibilities with W.C.P. concurrence.

3. W.C.P. available as needed to assist in establishing Orlando as a Profit Center beyond Disney.

4. D.E.L. complete control of Orlando Area to include all work within Central Florida Chapter of N.E.C.A. [National Electrical Contractors Association].

5. E.L.S. [Scott] completes NTC [Naval Training Center], Iron Bridge and Westinghouse.

6. E.L.S. used to produce basic labor and material with suggested end sheet estimates. W.C.P. and D.E.L. to establish final end sheet.

7. D.E.L. has complete control over all Paxson employees in Central Florida area.

8. D.E.L. annual salary to be $52,000. per year with annual increase to be negotiated between W.C.P. and D.E.L.

9. D.E.L. to share in profits that are under his direct control. 10% on all J.V. [Joint Venture] @ WDW [Walt Disney World] 20% on all Paxson only

> Please accept this as my resignation from the Paxson Electric Company effective May 15, 1981.
> If you feel that the thirty (30) days will not allow a smooth transition it could be extended for a reasonable period of time.

Scott testified that Lee verbally resigned on more than one occasion.

**3.** Lee testified that he handed the list to Paxson, that Paxson read the list, and Paxson then said that he had no problem with anything on it and agreed to all of the items. Lee claims that Paxson asked him if he wanted Paxson to sign the list or would his word be

Lee alleges Paxson verbally approved the list that references profit sharing on which Lee's claim is based.[3] Paxson testified that he did not recall Lee asking him for a percent bonus of the gross profit of the EPCOT work, Lee delivering the list to him, or a specific conversation regarding the list. Paxson clearly stated he would not and did not agree to the listed items, especially the profit sharing arrangement since that was clearly inconsistent with Debtor's established business practices. Paxson testified that Debtor never had such a bonus arrangement with any of its employees. Lassetter, an employee of Debtor for thirty years, was not aware of any Debtor employee ever receiving such a bonus and that he would be surprised if Paxson made such an agreement with Lee. Other employees confirmed this practice regarding bonuses. Even Scott and Lassetter, who were Vice Presidents of the company and oversaw multiple project managers, did not receive such bonuses.

Lee suggested his services were unique to Debtor. However, Lee was a project manager both before and after the EPCOT work. Lee's duties did not significantly change during the EPCOT work. Rather, Lee's duties remained comparable to other project managers, although his workload did substantially increase as the EPCOT joint venture matured. Warren Klecan ("Klecan"), a Debtor project manager from 1970 through 1986, testified that one year Klecan was responsible for sixty percent of

good enough. Lee claims he responded that Paxson's word was good enough and that he then agreed to withdraw his resignation and return to work. Lee testified that Paxson told him not to discuss this agreement with anyone because Debtor had never made such a profit sharing arrangement. Paxson testified that after Lee indicated a desire to leave the company that the two met to discuss the situation, but Paxson did not recall the specific details of that meeting. Paxson admits to trying to convince Lee to stay with the company and that a copy of Lee's nine-point list was in Debtor's files since April 1981.

the Debtor's current volume of business under contract but did not receive a bonus based upon a percentage of profit realized. Lee was compensated like other Debtor employees. He received a generous salary, participated in Debtor's profit-sharing plan, was compensated for transportation, and received annual discretionary bonuses from Debtor.

Debtor claims that they first realized Lee sought a large bonus in April 1983 when Paxson received a memo from Lee that outlined proposed bonuses for joint venture employees, which included a proposed $650,000.00 bonus for Lee. Debtor responded to Lee's memo in writing and delivered a $50,000.00 check to Lee. Paxson testified he did not receive any objection from Lee concerning the $50,000.00 check.

Debtor's award of bonuses was purely at Paxson's discretion. Paxson testified that Debtor's primary consideration in awarding bonuses was Debtor's pre-tax profit on all of the projects, but that profitability of particular projects was not a motivating consideration. Individual employees were also evaluated for performance during the current year with consideration given to their salary and bonus history.

From the time of the April 22, 1981 meeting until his resignation on June 8, 1983, Lee worked at EPCOT on Debtor's major electrical construction contracts. Debtor performed over twenty projects at EPCOT, all of which Lee managed. There is no doubt that Lee worked hard and was considered Debtor's key on-site person at EPCOT. Additionally, Lee took on more responsibility as the EPCOT work progressed. However, Lee claims that hourly union workers made more money than he through overtime pay and extended shifts.

Lee claims that by the end of the EPCOT project that Lee collected over $35 million in revenue, with a net profit (after deducting costs) over $7.9 million. Lee completed Debtor's work and substantially fulfilled his work responsibilities to Debtor as a project manager at EPCOT in June 1983.

Lee puts great emphasis on his April 23, 1981 memorandum concerning an April 22, 1981 meeting with Paxson, that provides:

A lunch meeting was held 4–22–81 at Valle's Steak House next to the Indigo Inn in Daytona Beach between Don Lee and W.C. Paxson, Sr.

The meeting was held at Mr Paxson's request to discuss the conditions that would be required for myself to remain employed by the Paxson Electric Company.

During our meeting in Jacksonville on 4–15–81, Mr. Paxson asked that I give serious thought to the conditions that I desired in order for me to withdraw my letter of resignation of 4–13–81, and we will get together in a week to discuss them. Per his comments "You are not going to leave the Paxson Co., we have a few differences and we will work them out." A copy of the attached list containing nine (9) items was given to Mr. Paxson. He read it in depth and commented that he had "no real problem with any of it". He asked if I wanted him to sign it or was his word good enough. I replied that his word had been good enough to date so I guess it would still be good.

The discussion then changed to the future work in the Orlando area. I stated that I felt that the market was in the open shop field rather than the union shop and Mr. Paxson agreed; but said that he did not have anyone to run an open shop as long as I was tied up as Disney. I said I felt that I knew someone that might be interested if he cared to pursue the subject. He asked Who? I replied, Bob Berroyer, he appeared surprised and indicated the Bob would be a great choice if I am able to convince him. I replied that I was fairly certain that I could and I would do so and contact him for a meeting at a later date.

The meeting was drawn to a close and I left Mr. Paxson going to phone booth while I returned to Orlando.

Lee mailed a copy of this memorandum to Paxson who admitted receiving a copy.

Soon after, Lee, Paxson and Bob Berroyer ("Berroyer") met in Jacksonville to discuss organizing an open shop electrical contracting company. Lee testified that they agreed to form such a corporation, with Berroyer serving as its president, and that Lee would remain with Debtor to complete the EPCOT project contracts. Upon finishing the EPCOT projects, Lee would join the new company and become a stockholder. Lee claims that non-EPCOT portions of the nine-item list, such as establishing Orlando as a profit center beyond Disney and Lee having complete control over all employees in the central Florida area, would no longer be applicable, because Lee's responsibilities would be limited to EPCOT and Disney. Eventually, the Power Electric Contracting Company ("Power Electric") was incorporated and Berroyer served as president.

On June 8, 1983, Lee resigned from Debtor and became employed by Power Electric.[4] Lee testified that he periodically met with Paxson, both before and after the completion of EPCOT projects and that he discussed EPCOT profit sharing during those meetings. Lee claims that each time the issue came up, Paxson would request anyone else in the room to leave, and then Paxson would assure Lee in private that Debtor would pay Lee his agreed ten percent of the joint venture profits. Lee also alleges calling Paxson on numerous occasions after leaving Debtor to discuss his claimed EPCOT bonus.

Lee testified about an April 27, 1984 meeting with Paxson. At that time, Lee was president of Power Electric, and Paxson was its majority stockholder. Lee said that he brought up the subject of EPCOT profit sharing, and asked Paxson when he would be paid. Lee claims that Paxson told him at that meeting that Paxson would have a problem writing Lee a $650,000 check, but that Paxson understood he had agreed with Lee to pay the ten percent (10%). Lee testified that Paxson never told Lee that Paxson had not agreed to such a deal or that Paxson would not pay Lee the money.

On that same date, April 27, 1984, Lee prepared and mailed to Paxson a memorandum of that meeting. Item 4 of that memorandum provides that:

I[Lee] handed Mr. Paxson a copy of my 4–15–83 Memo and stated "now that EPCOT is finalized; what is the plan to resolve the outstanding itmes (sic) on this memo that you and I agreed to?" Mr. Paxson stated "With the exception of yourself, I did everything that is on the list." When I pointed out to him that was not correct he seemed surprised and again stated "You and I agreed to this and I thought that I had done as you and I agreed. If I didn't I need to find out why. I will look into this and let you know something."

He further stated "As far as you are concerned I am going to have great problems in writing you a $650,000.00 check. I understand that you and I agreed to the 10% but I do not intend to write that size check."

A rather lengthy discussion followed with the finalization being that Mr. Paxson would review the problem and get back to me. I had a gut feeling that what he wants to do would make some level of payment now out of the Joint Venture settlement and agreed to some

---

4. Lee's letter of resignation addressed to Paxson provides that:

Per our previous discussion please accept this as my written resignation from the Paxson Electric Company effective June 15, 1983. As we agreed, I will continue to represent you as a consultant on all contracts that I was previously involved until their finalization. It is unfortunate that the market conditions in this area precipitated this action. It has been a very enjoyable and enlightening 15 years. Hopefully we both will be able to profit from it in the future.

means of taking the balance out of his portion of P.E.C. profits until the agreement is fulfilled.

At no time did I get the feeling that he did not intend to fulfill his agreement; but that the magnitude·was such that it was going to have to be spread over a longer period of time or compensation in some other form be made to offset it.

That same memorandum ended with the following:

At no time during the course of the meeting were there any harsh tones or disagreements just "We have this problem and it is to both of our best interest to reach a solution that is agreeable to both."

The meeting came to a close with Mr. Paxson walking me to the door saying "Don't get discouraged, stay with me and you will make a lot of money."

In 1990, while Lee served as president of Power Electric and held a minority equity position, Paxson and his son, who held a majority equity position, decided to consolidate Power Electric with another company controlled by the Paxsons. Lee testified that he opposed the merger, and he decided to leave Power Electric. Lee claims that he gave up his interest and received a distribution of profits from Power Electric but that he subsequently put money back into Power Electric to pay its debts. Lee felt that his resignation as president of Power Electric ended his relationship with Paxson, which began in 1969.

Paxson and Lee signed the following:

MEMO

TO: Wesley C. Paxson, Jr. FROM: Don Lee

DATE: August 28, 1990

REFERENCE: Power Electric Contracting Company Close Out

Per our conversation in this office in May and coupled with the recent revision on how to consolidate St. Johns Electric and Power Electric I would like to take you up on your offer to have a signed detailed agreement between us as to the close out of Power Electric. I believe this would be to the best interest of both of us and you never know "Lightning could strike a # 1 Iron and Elbert could drive a Greyhound Bus thru Orlando".

To the best of my knowledge below are listed the cumulate items that we have discussed at various times that will constitute the close out of Power Electric:

1. Power Electric will pay off all loans ($800,000.00 to First Union National Bank of Florida only at this writing).

2. All existing contracts and G & A will be paid in full such that *no* Debt exists.

3. No efforts to dilute stock ownership or adding additional G & A cost to dilute Profits will be made.

4. Due to Power Electric Contracting Company being a Sub–Chapter S Corporation at this time the first $1.2 Million of profit will be distributed 51% W.C. Paxson, Jr., 49% D.E. Lee.

5. The next $400,000.00 after the first $1.2 Million will be 100% to D.E. Lee. This is a $204,000.00 bonus given to D.E.L. by W.C.P., Jr. for his efforts in turning P.E.C. around.

6. All profits in excess of $1.6 Million will be split 51% W.C.P., Jr. and 49% D.E.L.

7. After completion of all financial matters W.C.P., Jr. has offered to turn over all stock of P.E.C. to D.E.L. so that he ownes (sic) P.E.C. 100% with P.E.C having $0 value and is a name only.

Wesley, to the best of my knowledge this represents the various items that you and I have discussed over the last few months. I believe both of us will feel better and be better off if each of us has a signed copy in our files.

In December 1991, Lee sent Paxson what Lee claims was his last memorandum. This memorandum was a copy of Lee's April 15, 1983 memorandum with handwritten revisions that showed that

Lee was still owed $662,724.00 based on the percent of profits he claimed from EPCOT projects. Paxson did not respond to this memorandum. Lee's lawyer sent Debtor a demand letter in 1992, and Debtor's lawyer responded with a letter denying that any such agreement had been made. Lee claims that was the first time he had been told that Paxson denied the existence of an EPCOT profit sharing agreement.

## LITIGATION HISTORY

In 1993, Lee filed a complaint against Wesley C. Paxson, Sr. and Debtor in the Circuit Court for the Ninth Judicial Circuit in and for Orange County, Florida. Lee's complaint alleged fraud and breach of contract. Lee later filed a First Amended Complaint for Damages for Breach of Contract and Fraud that added a count of fraud against Mr. Paxson. On November 9, 1993, the Circuit Court, Ninth Judicial Circuit, in and for Orange County, Florida entered an Order Granting Motion to Dismiss First Amended Complaint. This order dismissed allegations of fraud and directed that Mr. Paxson and Debtor answer to the allegations of breach of contract. The Fifth District Court of Appeal affirmed this order.

On August 24, 1995 an Order Bifurcating Trial and Staying Certain Discovery was entered. This order provides for two stages of trial. The first stage (jury trial) would resolve the issue as to Lee's rights, if any, to the relief sought. The second stage (another jury trial), if necessary, would address accounting and damages.

On March 5, 1997 the Circuit Court in Orange County, Florida entered Summary Judgment against Lee. The Court stated that:

1. There are no genuine issues as to any material fact and Defendant, Paxson

Electric Company, is entitled to Summary Final Judgment as a matter of law. Plaintiff's claim for enforcement of an oral employment agreement, as asserted against Paxson Electric Company in Count I of the Amended Complaint, the only claim remaining in this action, is barred by the statute of frauds, § 725.01, Florida Statutes.

2. Summary Final Judgment is entered in favor of Defendant, Paxson Electric Company and against Plaintiff, Donald E. Lee, who shall recover nothing from Defendant in this action, and Defendant shall go hence without delay.

On August 22, 1997 Lee filed a Second Amended Complaint against Debtor that contained allegations of breach of contract, quantum meruit, and unjust enrichment. On September 19, 1997 Debtor filed Defendant's Answer to the Second Amended Complaint denying all material allegations of the Second Amended Complaint and asserting various affirmative defenses. On October 4, 1997 Lee filed Plaintiff's Reply to Defendant's Affirmative Defenses, denying each defense.

On January 22, 1998 Debtor filed a motion for judgment on the pleadings concerning the breach of contract claims. Debtor claims that the relief requested is barred by the Statute of Frauds and that the previous summary judgment included the breach of contract claim. On January 29, 1998 Plaintiff filed a response to this motion claiming that Lee's full performance of the contract removes it from the full effect of the Statute of Frauds. Despite Lee's failure to address whether the previous summary judgment addressed this claim in his response, the Circuit Court entered an Order Denying Defendant's Motion for Judgment on the Pleadings as to Count I on April 21, 1998.[5] The

---

5. Circuit Judge Joseph P. Baker entered an Order Denying Defendant's Motion for Judgment on the Pleadings as to Count I provides:

This motion came on for hearing before the court on April 9, 1998 on the motion of defendant Paxson Electric Company for judgment on the pleadings as to Count I of plaintiff's second amended complaint. The court has considered the motion and pleadings, has heard argument of counsel, and is otherwise fully advised. It is hereby

case was set for a two-day jury trial beginning on July 27, 1998 with a pretrial conference to occur on July 20, 1998.

On July 17, 1998 Debtor filed a voluntary petition for Chapter 7 bankruptcy relief. Debtor's filing operated as a stay against further state court proceedings with Lee pursuant to Section 362 of the Bankruptcy Code. On November 23, 1998, Lee filed a proof of claim for $1,963,220.00, an amount including interest, based on wages, salary, and compensation, specifically unpaid compensation from 1981 to 1983. First Union National Bank also filed a proof of claim for $150,510.96 based on money loaned to Debtor. First Union's claim is nonpriority and unsecured.

On February 22, 1999 Debtor filed an objection to Lee's claim. On May 12, 1999, First Union filed a Notice of Joinder in Objection to Claim of Donald E. Lee (Claim No. 3).[6] On March 19, 1999 Lee filed a response to Debtor's objection. On March 26, 1999 Lee filed a Motion to Lift Automatic Stay for the purposes of completing the state court litigation with Debtor and liquidating Lee's claim in this bankruptcy case. At a hearing on May 26, 1999 the Court continued ruling on Debtor's objection until after the Court ruled on Lee's motion for relief from stay. On June 15, 1999 Lee filed an Amended Motion to Lift Automatic Stay. On June 21, 1999 Debtor filed a Motion for Summary Judgment on Objection to Claim of Donald E. Lee (Claim No. 3). Lee filed a response to the motion for summary judgment on July 8, 1999.

■ A final hearing was held on Lee's motion for relief from the automatic stay on August 18, 1999. On September 3, 1999, the Court issued findings of fact and conclusions of law supporting its decision not to lift the automatic stay in order for the parties to proceed in state court for resolution of the issues underlying this objection. *See In re Paxson Elec. Co.,* 242 B.R. 67 (Bankr.M.D.Fla.1999). The Court also entered orders denying relief from stay and denying Debtor's motion for summary judgment on September 3, 1999. The Court then scheduled a trial on the objection to Lee's claim. On November 26, 1999, Lee filed a Motion in Limine asserting that Debtor did not have standing to object to Lee's claim. The Court conducted a hearing on this motion prior to the trial on the objection and found no basis to grant the relief requested in Lee's Motion in Limine.[7]

### CONCLUSIONS OF LAW

Objections to claims are governed by 11 U.S.C. § 502(a), providing that "A claim or

---

ORDERED that defendant's motion is denied.

ORDERED at Orlando, Orange County, Florida this 21 day of April, 1998.

**6.** Counsel for First Union reiterated First Union's support and joinder in Debtor's objection at the trial.

**7.** Section 502(a) provides that a claim is deemed allowed unless a "party in interest" objects. 11 U.S.C. § 502(a). Courts consistently hold that a chapter 7 debtor is not a "party in interest" for the purpose of objecting to creditor claims. *See Caserta v. Tobin,* 175 B.R. 773, 774–75 (S.D.Fla.1994). However, courts recognize two exceptions: (1) where no trustee has been appointed; or (2) where there will be a surplus after distribution providing the Debtor with a pecuniary interest in the estate. *See Caserta,* 175 B.R. at 775. "If a Debtor can show a reasonable possibility of a surplus after satisfying all

debts, then the Debtor has shown a pecuniary interest and has standing to object to a bankruptcy order." *Cult Awareness Network v. Martino (In re Cult Awareness Network),* 151 F.3d 605, 608 (7th Cir.1998). Lee claimed that Debtor did not have standing to object to Lee's claim speculating that even if Lee's claim were to be disallowed, Debtor would not of receive any distribution because First Union's claim plus interest would consume all of the value the bankruptcy estate's assets. Debtor claimed that the value of estate assets exceeds the amount of First Union's claim. First Union appeared and joined in Debtor's objection to Lee's claim. The Court found that Debtor presented sufficient evidence of a possibility of receiving distribution from the estate if Lee's claim were disallowed and entered an order denying Lee's motion in limine on December 20, 1999.

interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects." Section 502(b) provides, "... [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount ...." A proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f) (West 2000).

■■ The burden of proof is on the objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim. However, the burden of ultimate persuasion rests with the claimant." *In re VTN, Inc.*, 69 B.R. 1005 (Bankr.S.D.Fla.1987) (citing *In re DeLorean Motor Co. Litig.*, 59 B.R. 329 (E.D.Mich.1986)).

Lee's proof of claim noted the basis for claim as wages, salaries, and compensation, specifically unpaid compensation from 1981 to 1983 in the amount of $1,963,220 (principal plus interest to date of petition), but makes no reference to amounts owed based on equitable relief. Attached to the proof of claim was an exhibit as to the interest calculation. At trial, Paxson pre-

sented ample evidence to rebut the prima facie effect of Lee's proof of claim. Therefore, the burden of ultimate persuasion rests with Lee.

Lee sets forth that all issues raised should be resolved in his favor in light of the evidence presented.[8] The Court disagrees. First and foremost, the Court finds that Lee failed to satisfy the requisite burden of persuasion to establish a basis for a claim. There is no doubt Lee worked hard and in the Court's view was well compensated for the work he did.[9] However, Lee failed to present sufficient evidence to establish that he was legally entitled to receive any EPCOT profits.

■■ Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms. *See Holloway v. Gutman*, 707 So.2d 356 (Fla. 5th Dist.Ct.App.1998), *review denied*, 722 So.2d 192 (Fla.1998). Mutual assent is an absolute condition precedent to the formation of a contract and without mutual assent, neither the contract nor any of its provisions come into existence. *See State v. Family Bank of Hallandale*, 623 So.2d 474, 479–80 (Fla.1993) (citing *Gibson v. Courtois*, 539 So.2d 459, 460 (Fla.1989)).

■■ In *Strong & Trowbridge Co. v. H. Baars & Co.*, 60 Fla. 253, 54 So. 92

---

**8.** The issues Lee posits are:

1. Whether Debtor and Lee entered into a valid oral agreement in 1981 that Debtor would pay Lee 10% of the profits on all Debtor's joint venture contracts at Walt Disney World under Lee's control.
2. Whether Debtor breached that agreement.
3. Whether the agreement is subject to the Debtor's defense of the Statute of Frauds, and if so, whether the agreement violates the Statute of Frauds.
4. Whether the agreement is subject to the Debtor's defense of the two-year Statute of Limitations for wages, Fla. Stat. § 95.11(4) (1991), and if so, whether the agreement violates that Statute of Limitations.
5. Whether the equitable defense of laches is applicable to Lee's claim, and if so, whether Lee unreasonably delayed bringing his claim, to Debtor's prejudice.

6. Whether the agreement is subject to the Debtor's defense of waiver, and if so, whether Lee waived his claim.
7. Whether Debtor owes Lee a percentage of the profits from the joint venture, and if so, the principal amount that Debtor owes Lee under the agreement, with interest.

**9.** While Lee complained of hourly workers receiving more money, he did receive a $50,-000.00 bonus, nearly equivalent to his annual salary. Additionally, it appears that Lee fails to fully acknowledge the effect of the joint venture with Hatzel–Buehler. Debtor and Hatzel–Buehler set the stage for all the work Lee was to perform. While Lee may have been responsible for subsequent opportunities for Debtor, Lee was certainly not responsible for initiating the EPCOT work.

(1910), the Florida Supreme Court explained that there must be mutuality of assent in order to create a contract:

> In order to create a contract, it is essential that there should be a reciprocal assent to a certain and definite proposition. So long as any essential matters are left open for further consideration, the contract is not complete, and the minds of the parties must assent to the same thing in the same sense.
>
> In the making of a valid contract, the parties must not only be capable of an intelligent assent, but they must actually give their assent; and the assent must be precisely the same thing, and at the same instant of time. Consequently, if one assents to a certain thing and the other assents to it only with modifications, or if one assents to it at one time and the other at a different time, no agreement or contract arises therefrom. From this it is clear that an offer must be accepted before it can become a binding promise. While the assent of both parties must be at the same instant of time, it is not necessary that the communication shall be simultaneous.
>
> The acceptance of an offer, to result in a contract, must be: (1) Absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly required by the offer. If a person offers to do a definite thing, and the person to whom the offer is made accepts conditionally, or introduces a new term into the acceptance, his answer is not an acceptance; but it is either a mere expression of willingness to that, or it is in effect a counter offer, which must be accepted or assented to before a contract can result. It is also essential that the acceptance shall be

made in the manner, at the place, and within the time expressly or impliedly designated in the offer. The proposer has the right to dictate terms in respect to the time, place, and manner of acceptance, and when he does so, like other terms, they must be complied with.

*Strong & Trowbridge Co. v. H. Baars & Co.*, 60 Fla. 253, 54 So. 92, 93–94 (1910) (citations omitted).

 The evidence presented fails to establish that there was a meeting of the minds on EPCOT profit sharing. Lee says Paxson orally approved EPCOT profit sharing.[10] Paxson claims he would have never made such a deal on behalf of Debtor. Lee presented no solid evidence to bolster his position that Debtor would and did make such an agreement. Though the nature of these business dealings appears quite complex, the issue boils down to the fact that there was no meeting of the minds on essential elements that Lee propounds and therefore, there can be no enforceable contract.

> In order that there be a contract, the parties must have a definite and distinct intention, common to both, and without doubt or difference. Until all understand alike, there can be no assent, and therefore no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. Without a meeting of the minds, there can be no contract of any kind.

*Webster Lumber Co. v. Lincoln*, 94 Fla. 1097, 115 So. 498, 502 (1927). *See also David v. Richman*, 568 So.2d 922, 924 (Fla.1990) (contract never formed because there was no mutual assent as to essential terms). Lee asks the Court to find, via his own testimony and the unsigned nine-point list, that an enforceable contract existed and that Debtor breached this contract.[11]

---

**10.** In his Post–Trial Memorandum, Lee claims that he made an offer to Paxson and that Paxson accepted Lee's offer.

**11.** Lee also seeks an inference from Debtor's failure to respond to various correspondences

that an agreement existed as to EPCOT profit sharing. These potential inferences are outweighed by Paxson's explicit denial that such an agreement was made.

Lee received a generous salary and bonus from Debtor. After leaving Debtor, Lee remained in business with Paxson and served as president of Power Electric. There is ample evidence to show that Lee and Paxson maintained a long-term business relationship and both seemed to profit from the relationship. However, throughout this business relationship there is no evidentiary basis to find that a contract existed where Lee would share in the profits of EPCOT projects.

The issues of statute of limitations and Florida's Statute of Frauds hinge upon a finding that an enforceable agreement actually existed and therefore, do not need to be addressed upon this Court's determination that an enforceable agreement did not exist. Additionally, on March 5, 1997 the state court entered a summary final judgment as to Lee's amended complaint and specifically found that Lee's claim for enforcement of an oral employment agreement was barred by the statute of frauds. The parties did not fully argue whether this Court was collaterally estopped by the state court's summary judgment. Regardless of any intrusion on the determination made by the state court, the result remains the same.

 The Court notes that Lee's second amended complaint in state court sets forth counts for breach of contract, fraud (count dismissed by November 9, 1993 court order), quantum meruit, and unjust enrichment. The Court specifically finds no contract existed and therefore no contract could be breached. Although, Debtor's Post–Trial Memorandum ad-

dresses equitable grounds plead by Lee in state court, Lee explicitly provided in his Amended Post–Trial Memorandum of Facts and Law (Doc. 92) that "Lee's claim, being for breach of contract, is a purely legal action for money damages, and not one in equity." Additionally, Lee's proof of claim makes no reference to amounts owed based on equitable principles. Accordingly, the Court finds that Lee abandoned prior equitable claims.[12]

Finally, the Court notes Lee's challenge of Paxson's credibility, which was placed in issue at trial. The Court does not find that Paxson presented false or misleading testimony. Nor does the Court share Lee's position that Paxson has an interesting selective memory. Rather, the Court views Paxson as trying to convince Lee to continue working on EPCOT projects as not to disrupt them and that Debtor and/or Paxson would "take care" of Lee if Lee did so. The Court finds that Lee and Paxson maintained different interpretations of "take care" and that their varying interpretations of "take care" did not explicitly amount to an enforceable promise to compensate Lee with a percent of EPCOT profits.

### CONCLUSION

Lee has not shown by a preponderance of the evidence that he is entitled to a claim in this bankruptcy case. Lee's testimony and the unsigned self-produced nine-point list simply fail to provide an adequate basis to establish a legal claim in light of other evidence showing that Debtor never made such a profit sharing agree-

12. Additionally, Lee failed to establish entitlement to a claim based on equitable principles. There is no doubt that Lee conferred a benefit upon Debtor, however, Lee was adequately compensated for the benefit conferred. Debtor claims that because Lee alleges the existence of an oral contract, Lee is precluded from seeking equitable relief under the theory of unjust enrichment. See Poe v. Estate of Levy, 411 So.2d 253 (Fla. 4th Dist.Ct.App. 1982). However, there is contrary legal authority. See Thunderwave, Inc. v. Carnival Corp., 954 F.Supp. 1562 (S.D.Fla.1997) (quot-

ing Hazen v. Cobb, 96 Fla. 151, 117 So. 853 (1928)). Nevertheless, the Court finds no grounds for equitable relief in this case. Lee was compensated for his services and presented no evidence that Debtor was unjustly enriched. See Challenge Air Transp. v. Transportes Aereos Nacionales, S.A., 520 So.2d 323 (Fla.3d Dist.Ct.App.1988). See also Gene B. Glick Co. v. Sunshine Ready Concrete Co., 651 So.2d 190 (Fla. 4th Dist.Ct.App.1995) (unjust enrichment cannot exist where payment was made for benefit conferred).

ment. Accordingly, Debtor's objection is sustained.