**In re ANNICOTT EXCELLENCE, LLC, Debtor.**

No. 99–8363–3F1.

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

March 28, 2001.

---

David E. Otero, Jacksonville, FL, for debtor.

Daniel M. Litt, Washington, DC, for Allied Capital Corp. and LaSalle National Bank.

Kenneth Wolis, Hollywood, FL, for Singer.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Case is before the Court on the Objection to Claim No. 7 ("Objection") Filed by Andrew Singer ("Singer") filed by Annicott Excellence, LLC ("Debtor") on June 26, 2000. (Doc. 118.) Singer responded to the Objection on August 7, 2000. (Doc. 122A.) The Court held an evidentiary hearing on the Objection on January 18, 2001, after which the Court took the matter under advisement. (Doc. 172.) Upon review of the evidence presented and upon review of the arguments and submissions of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

In March 1999, Debtor, owner and operator of five mobile home parks located in Brevard County, Florida and Broward County, Florida, hired Singer as a part-time manager of the Lakeshore Mobile Home Park ("Lakeshore") in Pembroke Pines, Florida, where Singer had lived for about ten years. Debtor and Singer did not enter into a written employment contract.

Singer also worked full-time as an independent tile installer.

Singer's primary duty as manager of Lakeshore was to collect the rent. Singer also performed occasional simple maintenance on the property and kept Debtor's Arizona headquarters apprised of the park's condition. Singer also routinely offered to perform any maintenance costing over $100.00. Barbara Winn ("Winn"), Debtor's vice president of operations, acted as Singer's supervisor and contact person in Arizona. Bruce Whipple ("Whipple"), Debtor's chief executive officer, testified that Singer and Winn spoke almost daily.

Debtor allowed Singer to live rent-free on a lot at Lakeshore in exchange for his services. According to Whipple, Singer's rent would have been about $330.00 per month. In addition, Debtor paid Singer a $300.00 monthly salary. In April 1999, Debtor paid Singer a $300.00 bonus for exemplary rent collection efforts.

On June 9, 1999, heavy rains hit South Florida and began to cause the water level of Lakeshore's central lake to rise and threaten nearby mobile homes. Several feet of standing water accumulated in the streets of Lakeshore during the storm.

On June 9, Singer faxed Winn to inform her that the overflow from the lake was beginning to flood the park. (Singer's Ex. D.) Singer asked Winn for permission and money to rent pumping equipment that day, but could not recall Winn's answer. Singer did not take any action to lower the water on June 9.

On June 10, the rain continued to fall, and Singer called Winn again. Winn gave Singer permission to rent pumping equipment and to begin draining the water out of the park's byways. It is unclear whether Winn offered Singer any reimbursement or compensation for pumping out the water at this point.

Just after noon on June 10, Singer rented a centrifugal water pump and a hose from Alltool Rental Co. ("Alltool") in Hollywood, Florida. (Singer's Ex. F.) Singer began pumping floodwater out of Lakeshore around midday on June 10. According to David Keller, manager of Alltool, the centrifugal pump could pump out about 25,000 gallons per hour. (Debtor's Ex. A.) Singer returned this pump one hundred and forty-six hours after renting it.

Singer testified that, at the time he rented the first pump, he had no idea exactly

how much water would have to be pumped out to clear the park of flooding.

According to Singer, he spent the next nine days pumping twenty-four hours a day. Singer asserted that the pump required round-the-clock refueling and supervision.

On June 11, Singer called Winn in Arizona to apprise her of the situation and requested that Winn pay him twenty-five cents per gallon for pumping out Lakeshore. Singer testified that Winn assented to that price. Whipple testified that Winn lacked the authority to bind Debtor to such an agreement, and that Winn would not have entered into such an agreement.

On June 15, Singer rented a second, identical centrifugal pump from Alltool at the same rate. Singer returned this pump twenty-six hours after renting it. (Debtor's Ex. A.)

On June 16, Singer became concerned that floodwater was running out of another mobile home park next to Lakeshore and filling Lakeshore with water as quickly as he could pump it out. Singer purchased three hundred sixty-pound bags of concrete from Home Depot at a cost of $543.80 and enlisted some hands to help him build a wall between Lakeshore and the neighboring park. Singer testified that he paid these helpers $10.00 to $12.50 per hour.

On June 17, Singer faxed Winn indicating that he had "requisitioned" $1,000.00 up to that point, and requesting that he be allowed to spend $3,000.00 more to address Lakeshore's "urgent and immediate needs." (Debtor's Ex. B.) According to Singer's fax, the city of Pembroke Park requested that Debtor remedy any flood control problems once and for all.

On June 18, Singer entered into an agreement with Home Depot to provide six hundred more sixty-pound bags of concrete to Lakeshore. Singer agreed to pay Home Depot $1,017.60 for the bags and for transport to Lakeshore.

On June 18, Singer faxed Winn indicating that he had entered into an agreement with Lakeshore residents by which the residents would pay rent in cash for an "emergency period" not to exceed ninety days. (Debtor's Ex. C.) According to Whipple, Singer was not authorized to collect rent in cash.

On June 19, Singer faxed a note to Debtor, the Pembroke Park city council, and the Miami Herald indicating that "Lakeshore is safe now." (Debtor's Ex. D.)

On June 19, Singer also wrote Debtor that the wall around Lakeshore was seventy-five percent complete. The finished wall stands two to three feet high and stretches about two hundred feet along the border between Lakeshore and its neighbors.

On June 20, Singer faxed Debtor a photocopied newspaper clipping on the flooding at Lakeshore and wrote in the margin, "FULL DISCLOSURE—$1,000,000.00 DUE." (Debtor's Ex. F.) Whipple called Singer to indicate his unease with this request. Singer told Whipple that he fully intended to collect $1,000,000.00 from Debtor for his efforts in draining and walling off Lakeshore.

On June 21, Whipple flew to South Florida to speak with Singer about the $1,000,000.00 demand and to appraise the situation. Whipple met with Singer in his rental car at Lakeshore. Singer demanded another $42,000.00 for building the wall. Singer refused to hand over the rent money in his possession.

Whipple left Lakeshore and called the Broward County Sheriff's Office. A sheriff's deputy met Whipple at Lakeshore and confronted Singer in his mobile home about the withheld rent money. Singer presented Whipple with two contracts to sign—one for the payment of $1,050,001.50 for pumping 4.2 million gallons of floodwater out of Lakeshore (Debtor's Ex. I) and one for the payment of $42,000.00 for

building the wall (Debtor's Ex. J). Whipple refused to sign the contracts. Singer resigned as manager and handed over the collected rent money. The deputy seized the documents Singer supplied, which included copies of receipts for expenses incurred during the flood abatement efforts. (Debtor's Ex. O.)

According to these receipts, Singer incurred $3,025.05 in flood-related expenses. It is unclear from the evidence whether Singer was reimbursed for these expenditures.

Upon Singer's resignation as manager, he once again became liable for rent on his mobile home lot.

On July 16, 1999, Singer filed a Claim of Lien against Lakeshore with the Clerk of Broward County. (Singer's ex. I.) Singer claimed a lien in the amount of $1,585,750.00.

On September 9, 1999, Singer wrote Debtor threatening legal action for the collection of an "overdue balance" of $1,585,750.00 and $1,555.53 in out-of-pocket flood-related expenditures. (Debtor Ex. M.) Debtor provided receipts documenting the expenses incurred. Singer stated that he would offset the latter amount against his rent.

On November 1, 1999, Debtor voluntarily filed for Chapter 11 bankruptcy protection. (Doc. 1.)

On January 3, 2000, Singer filed a Proof of Claim in the amount of $1,585,750.00 for "services performed" and "material and labor." Singer contends that this claim is secured by the lien filed against Lakeshore on July 16, 1999.

On June 26, 2000, Debtor filed the instant Objection to Singer's claim. (Doc. 118.)

On August 28, 2000, Singer filed a Motion for Change of Venue of the Objection. (Doc. 130.) Singer argued that the Objection should be tried in Broward County for convenience and ease of access to evidence.

On October 15, 2000, Debtor evicted Singer from Lakeshore. According to Debtor's records, Singer owes $6,369.90 in unpaid rent and late charges. (Debtor's Ex. N.)

On October 17, 2000, the Court denied the Motion for Change of Venue. (Doc. 149.)

On October 17 Debtor also filed Adversary Proceeding No. 00–329, challenging Singer's asserted lien on Lakeshore. This Proceeding is set for trial on April 10, 2001.

On January 18, 2001, the Court held a hearing on the Objection. Allied Capital Corporation and LaSalle National Bank, Debtor's two largest secured creditors, joined Debtor in arguing that Singer's Claim was not based on a valid express contract and that no equitable reasons existed for granting Singer a claim under the doctrine of quantum meruit. Singer countered that Winn, under apparent authority from Debtor, assented to two express oral contracts, one for the pumping of floodwater at twenty-five cents per gallon and one for the construction of the wall for a reasonable price.

## CONCLUSIONS OF LAW

### I. OBJECTION TO CLAIM STANDARDS

Objections to claims are governed by 11 U.S.C. § 502(a), providing that "A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, ... objects." Section 502(b) provides, "... [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount...." A proof of claim filed in accordance with the rules "shall constitute prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f) (2001).

■ The burden of proof is on an objecting party to produce evidence "equivalent in probative value to that of the creditor to rebut the prima facie effect of the proof of claim. However, the burden of ultimate persuasion rests with the claimant." *In re VTN, Inc.,* 69 B.R. 1005 (Bankr.S.D.Fla.1987) (citing *In re DeLorean Motor Co. Litig.,* 59 B.R. 329 (E.D.Mich.1986)).

The Court finds that Debtor presented sufficient evidence so as to rebut the prima facie effect of the proof of claim. The Court now proceeds to determine whether or not Singer provided sufficient evidence of any enforceable contracts or equitable grounds entitling him to an allowed claim against Debtor's estate.

## II. CONTRACTUAL BASIS FOR CLAIM

### A. Preliminary issue—Winn's authority to bind Debtor

The Court finds it necessary to determine, as a preliminary matter, whether Winn had the authority to bind Debtor into a contract with Singer.

#### 1. Actual authority

Debtor presented sufficient evidence, in the form of Whipple's testimony, to establish that Winn did not have the actual authority as vice president of Debtor to enter into the contract alleged by Singer.

#### 2. Apparent authority

Singer argues that he detrimentally relied on Winn's apparent authority to enter into the alleged contract on Debtor's behalf, thus obligating Debtor despite the absence of actual authority.

#### a. Apparent authority standard

■ Under Florida law, a party alleging apparent authority must establish the existence of three facts in order to establish apparent authority to contract: (1) a direct or implied representation of agency by the alleged principal; (2) reliance on that representation by the party alleging agency; and (3) detrimental reliance on the representation by the party alleging agency. *See Almerico v. RLI Insurance Co.,* 716 So.2d 774, 777 (Fla.1998).

#### b. Application to the instant case

■ The Court finds that Singer presented evidence sufficient to satisfy the three-prong *Almerico* test.

First, the Court is satisfied that Debtor gave Singer the impression, through direct representation or through course of dealing, that Winn had the authority to bind Debtor. Singer testified that he was told to contact Debtor through Winn, and it is clear from Singer's conduct during the flooding that Singer had been given the impression that Winn had the authority to bind Debtor. When Singer felt that pumps and a wall were necessary to save Lakeshore, Singer contacted Winn and offered to pump the water out and to build a wall. Debtor did not present any evidence that Singer had unilaterally chosen Winn as his immediate contact and superior, or that Winn had misled Singer into believing that she could authorize expenditures, reimbursement or compensation.

Second, the Court is satisfied that Singer relied on Debtor's representation of Winn's authority in undertaking the pumping of the floodwater and the building of the wall. It is unreasonable to conclude that Singer would have undertaken the extensive work of draining the park and building the wall without the belief that Debtor was bound to reimburse him and compensate him on account of Winn's assent to the repairs.

Finally, the Court is satisfied that Singer detrimentally relied on Debtor's representation of Winn's authority. Singer spent considerable sums on pump rental, concrete bags, and other equipment and manpower in reliance on his belief that Debtor would be obligated to reimburse him and compensate him on account of Winn's assent to the repairs.

Therefore the Court finds that Winn had the apparent authority to bind Debtor to a contract with Singer. The Court may now determine whether enforceable contracts were actually formed by Singer's offers to drain and build a wall combined with Winn's alleged assents.

### B. The existence of express contracts to pump the floodwater and build the wall

Debtor argues that no enforceable contracts for compensation for pumping out the floodwater or for construction of the wall exist because there was no mutual assent on the essential terms of any such contracts and because Singer did not provide any consideration for any such contracts.

#### 1. The existence of mutual assent to essential terms

#### a. The requirement of mutuality in general

■ Under Florida law, a valid, enforceable contract does not exist unless all parties to be bound agree on sufficient essential terms. *See In re Paxson Electric Co.*, 248 B.R. 451, 461–62 (Bankr. M.D.Fla.2000). "In the making of a valid contract, the parties must not only be capable of an intelligent assent, but they must actually give their assent; and the assent must be precisely the same thing, and at the same instant of time." *Id.* at 462. (quoting *Strong & Trowbridge Co. v. H. Baars & Co.*, 60 Fla. 253, 54 So. 92, 93–94 (Fla.1910)). If there are essential terms left open for future negotiation, then there has been no simultaneous mutual assent and no enforceable contract has been formed. *See id.*

#### b. The requirement of mutuality in employment and personal service contracts

■ An employment contract will be found unenforceable for lack of mutual assent if the duration of the employment is left open. *See Spanish Broadcasting System of Florida, Inc. v. Alfonso*, 689 So.2d 1092, 1094 (Fla.3d Dist.Ct.App.1997). Additionally, an employment contract will be found unenforceable for lack of mutual assent if compensation or the method of determining compensation for the employment is to be negotiated later or is left entirely to the discretion of one of the parties. *See Martin v. Jack Yanks Construction Co.*, 650 So.2d 120, 121 (Fla.3d Dist.Ct.App.1995).

■ However, an employment contract manifests mutual assent if the wording and circumstances of the contract indicate that the employment will last until the completion of a particular project, such as the renovation of a new cable television facility or an organization's offices. *See Olive v. Tampa Educational Cable Consortium*, 723 So.2d 883, 884 (Fla.2d Dist. Ct.App.1998). Additionally, a compensation term may be left open if the parties agree upon a practicable method of computing compensation in the future or specify that a "reasonable" amount will be paid. *See May v. Sessums & Mason, P.A.*, 700 So.2d 22, 26–27 (Fla.2d Dist.Ct.App.1997) (quoting *Corbin on Contracts*, 1 *Corbin on Contracts* § 4.3 at 567 (Joseph M. Perillo, Rev. ed.1993)).

#### c. Application to the instant case

The Court finds that Singer presented sufficient evidence to establish that the parties mutually assented to sufficient essential terms such that enforceable contracts exist binding Debtor to compensate Singer for the pumping out of the floodwater and for the building of the wall.

#### i. The pumping contract

■ Singer testified that, when he called Winn and requested twenty-five cents per gallon to pump water out of Lakeshore, Winn replied that Singer should do "whatever it takes." Debtor did not present any evidence to contradict this admission. The Court finds that such an assenting statement by Winn constitutes

acceptance of Debtor's offer to pump the floodwater out of Lakeshore. The Court finds that insufficient evidence was presented to conclude that this statement constitutes assent to the payment of twenty-five cents per gallon for the pumping.

The Court finds that the June 10, 1999 exchange between Singer and Winn must be analyzed in light of Singer and Winn's customary course of dealing throughout Singer's tenure as manager of Lakeshore, keeping in mind the modern legal recognition of the relational nature of contracts. The circumstances of Singer's relationship with Winn, as designed by Debtor, supply the apparently absent essential terms.

The course of dealing between Singer and Winn established a pattern of informal offer and acceptance of non-routine maintenance contracts such as those currently alleged by Singer. Singer would call Winn and offer to perform such non-routine maintenance in exchange for a promise of future reimbursement. Winn would normally accept Singer's offer and allow Singer to draw upon funds on hand for the repair or would promise to reimburse Singer for reasonable costs at a later date.

In this context, Winn's simple assent to Singer's request to rent pumps and drain Lakeshore takes on legal significance. The established informal offer process was on Singer's mind when he faxed Winn on June 9 and asked for permission and money to rent pumps to empty the park of water. Apparently, Winn either failed to respond to or denied this request. On June 10 Singer called Winn with another offer to hire pumps and drain the park in exchange for reimbursement and for twenty-five cents per gallon of water pumped.

Winn clearly understood, or should reasonably have understood, the offer Singer was making and the expectations behind that offer. Singer was offering to perform some non-routine maintenance outside of his ordinary scope of employment for reimbursement and some additional compensation. Winn knew from the course of dealing between her and Singer what assent to repairs meant: acceptance of Singer's offer.

Similarly, the duration of the contract is a matter of common sense. Winn could expect performance until the proposed job, pumping out the park, was complete.

The Court distinguishes the instant situation from the fact pattern in *Paxson Electric*, where this Court held that the parties did not come to mutual assent on essential terms. *See Paxson Electric*, 248 B.R. at 461. In *Paxson Electric* the purported offer and acceptance did not flow from the longstanding custom between the parties. *See id.* at 462. In fact, the terms of the purported contract seemed an incredible departure from the prior course of dealing. *See id.* "There is ample evidence to show that Lee and Paxson maintained a long-term business relationship and both seemed to profit from the relationship. However, throughout the business relationship there is no evidentiary basis to find that a contract existed where Lee would share in the profits of EPCOT projects." *Id.* at 463. The course of dealing led this Court to conclude that such a sudden shift in the compensation of the claimant could not possibly have been intended or assented to. *See id.*

In the instant case, the course of dealing reveals exactly the opposite: that Singer and Debtor, through Winn, routinely entered into these sorts of offer-to-repair oral contracts for an unspecified amount of reimbursement or compensation.

In the past Singer had been satisfied with reimbursement as compensation. No doubt the extreme nature of the particular situation inspired Singer to request some additional compensation in exchange for his efforts to pump out the park.

The Court finds that mutual assent was not reached on the amount of twenty-five cents per gallon as compensation for pumping out Lakeshore. Singer testified that he came to this figure arbitrarily, and that he had no idea how much water had

flooded Lakeshore. Winn obviously could not have anticipated the cost of entering into such a bargain. The extreme situation disabled either contracting party from reaching true assent on any per-gallon compensation.

The Court finds that a reasonable amount of compensation may be plugged in where this failed price term falls out. Winn was on notice that Singer expected some compensation for pumping out the park on top of reimbursement.

The Court finds $10.00 per hour reasonable compensation for manning the pumps. Singer testified that he manned the pumps almost twenty-four hours per day for nine days. However, the Court finds such testimony incredible. Because of a paucity of evidence on the actual number of hours worked by Singer, the Court finds it appropriate to adopt the number of hours the first pump was rented out, one hundred forty-six, as the duration of Singer's time manning the pumps. Therefore, if the Court finds the contract to pump out floodwater enforceable in all respects, then Singer will be allowed a claim for compensation in the amount of $1,460.00, plus a claim for reimbursement in the requested amount of $1,555.53, for pumping floodwater out of Lakeshore.

### ii. The wall contract

■ On June 17, 1999, Singer faxed Winn informing her of the need to resolve Lakeshore's flooding problems once and for all. It is clear from Singer's statement that the wall was seventy-five percent complete in his June 19 letter to Debtor that Winn had at some earlier point become aware of the wall's construction and had given Singer the go-ahead, or at least had silently accepted his offer to build the wall.

The Court finds that Singer presented sufficient evidence of mutual assent to essential terms on a contract for the building of a wall between Lakeshore and the neighboring parks. Once again, the context of the relationship between Singer and Winn lends legal significance to Winn's assent or failure to object to construction of the wall.

■ Because of the lack of evidence on the cost of labor and materials necessary for construction of the wall and because of the lack of evidence on reasonable compensation due Singer for construction of the wall, the Court determines that $5.00 per bag is a reasonable amount to cover expenses for labor and materials and to cover Singer's compensation. Singer and his makeshift crew laid nine hundred bags. Therefore, if the Court finds the contract to build the wall enforceable in all respects, then Singer will be allowed a claim for $4,500.00 for building the wall.

### 2. Singer's provision of consideration

Debtor finally argues that Singer's efforts during the flood do not constitute additional consideration for compensation above Singer's regular salary because Singer had a preexisting duty to take such measures as part-time manager of Lakeshore.

### a. Reasonability standard for determining preexisting duties

Debtor alleges that the terms of Singer's original oral contract as manager of Lakeshore bound him to pump out the floodwater and to build the wall to protect the park, thus barring the enforcement by Singer of any later contract for additional compensation for performance of those duties.

■ Under Florida law, performance that does not differ from what was previously due is insufficient consideration to support an enforceable promise. *See International Insurance Co. v. Johns*, 874 F.2d 1447, 1465, n. 36 (11th Cir.1989).

Therefore, the Court finds that a promise by an employee to perform for additional compensation an act within the scope of an already established employment relationship is insufficient to support

an enforceable contract for such additional compensation.

However, even a "trifling" difference between the employee's normal duties and a new performance offered as consideration for some additional compensation will support a new contract. *See Greenfield v. Millman*, 111 So.2d 480, 482 (Fla.3d Dist.Ct.App.1959) (quoting 1 Williston, Contracts, § 131–B).

The Court finds that if an employee can show at least a "trifling" difference between his everyday employment duties and the duties allegedly supporting additional compensation agreed to by an employer, than the agreement for additional compensation is not unenforceable on preexisting duty grounds.

The Court finds it appropriate to apply a reasonability standard in determining whether a particular act constitutes a departure from an employee's normal duties so as to support a separate contract for additional compensation. Florida courts use a reasonability standard in determining whether or not an employee's failure to perform a particular requested act constitutes grounds for justifiable dismissal and thus denial of unemployment benefits. *See Madison v. Williams Island Country Club, Ltd.*, 606 So.2d 687, 688 (Fla.3d Dist.Ct.App.1992).

The Court finds that seemingly extra or different work that an employer may reasonably mandate that an employee perform under threat of dismissal does not constitute new work outside of an existing employment relationship sufficient to act as consideration for a contract for additional compensation. In other words, if an employee may be justifiably fired for not doing a particular act requested by an employer, then an employee may not enforce a contract with an employer to pay additional compensation for performance of that particular act. Such an act is squarely within the mandatory zone of an employee's duties and is therefore square-ly covered by the original employment agreement and compensation.

### b. Application to the instant case

The Court finds that Singer's duties as manager of Lakeshore did not include the pumping of millions of gallons of floodwater and the building of a two-hundred foot long concrete wall. It would not have been reasonable for Debtor to dismiss Singer, a part-time manager whose common duties were to collect rent and to perform everyday maintenance, if he had refrained from the efforts to dry out Lakeshore. Singer's regular compensation, $330.00 per month in free rent and $300.00 per month in salary, would be unconscionably low if it obligated Singer to spend a week working overtime supervising pumps and coordinating construction efforts designed to drain Lakeshore and to permanently safeguard it from flooding. Singer presented sufficient evidence to support a finding that the extraordinary flood-control efforts could not reasonably be included within his preexisting duties as manager of Lakeshore, and therefore presented sufficient evidence to show that he provided new consideration for any contract to perform those flood-control efforts.

### III. EQUITABLE GROUNDS FOR CLAIM

Singer argues that he is entitled to a claim against Debtor's estate based upon the equitable doctrine of quantum meruit. However, this contention is without merit.

Under Florida law, a court may not grant equitable "quasi-contractual" relief if a court finds the existence of an actual, binding contract. *See May,* 700 So.2d 22, 28. "[I]t is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter." *Id.* (quoting *Kovtan v. Frederiksen,* 449 So.2d 1 (Fla.2d Dist.Ct.App.1984)).

794

Because the Court has found that Singer and Debtor entered into a binding, express oral contract concerning the subject matter at issue, the Court will not grant Singer the requested equitable relief.

## CONCLUSION

The Court finds that Singer and Debtor, through Debtor's apparent agent, entered into a binding contract for Singer to pump floodwater out of Lakeshore and to build a wall protecting Lakeshore from flooding in exchange for a reasonable amount of compensation. Therefore, the Court finds that Singer is entitled to a claim for $3,015.53, based on reasonable reimbursement and compensation for pumping out Lakeshore, and to a claim for $4,500.00, based on reasonable reimbursement and compensation for building a wall between Lakeshore and its neighbors.

The Court will enter a separate Order in accordance with these Findings of Fact and Conclusions of Law.